Richard L. Holcomb (HI Bar No. 9177)
Holcomb Law, LLLC
733 Bishop St, Suite 1478
Honolulu, HI 96813
(808) 545-4040
rholcomblaw@gmail.com

Alan Alexander Beck (HI Bar No. 9145)
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Alan.alexander.beck@gmail.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| BLAKE DAY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action 1:23-CV-00576 |
| | ) | |
| v. | ) | |
| | ) | |
| COUNTY OF HAWAI'I, | ) | VERIFIED COMPLAINT FOR |
| | ) | DECLARATORY AND |
| Defendant. | ) | INJUNCTIVE RELIEF; EXHIBITS |
| | ) | ONE THROUGH FOUR; |
| | ) | VERIFICATION OF BLAKE DAY |
| | ) | |
| | ) | |
| | ) | |

## VERIFIED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW the Plaintiff, Blake Day ("Mr. Day" or "Plaintiff") by and through his undersigned counsel, and complains of the Defendant as follows:

## I.    PARTIES

1.    Plaintiff Day is an adult male resident of the State of Hawaii, resides in the County of Hawaii, and is a citizen of the United States.

2.    Defendant County of Hawaii ("County") is a municipal corporation incorporated under the laws of the State of Hawaii. The County is authorized by law to control and maintain the Hawaii Police Department ("HPD"), an agency of the County, who acts on the County's behalf in the area of law enforcement and, as applicable here, the issuance or denial of firearms permits. The County is therefore ultimately responsible for HPD and its actions, and therefore, must assume the risks incidental to the maintenance of HPD, its employees, laws, customs and policies.

## II.    JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

4.    Venue lies in this Court pursuant to 28 U.S.C. § 1391.

### III.   <u>STATEMENT OF FACTS</u>

5.     Plaintiff Day works as an independent contractor for Five Brothers Asset Management ("Five Brothers").  Five Brothers contracts with mortgagees, lienholders, and other parties who have obtained title of real estate pursuant to foreclosure proceedings and/or are entitled to prevent waste once a borrower is in default.  Five Brothers secures, cleans, and provides other services to prevent waste and/or prepares the property for sale or auction.

6.     Once Five Brothers secures a contract from the title holder, Plaintiff Day is one of the contractors who actually performs the necessary work on behalf of Five Brothers.

7.     In January 2023, Mr. Day received a Work Order from Five Brothers. The Work Order instructed Mr. Day to clean and secure the property located at 11-3808 First Street, Volcano, HI 96785.  A true and correct copy of the Work Order is attached hereto as **Exhibit One**.

8.     Mr. Day was led to believe (by his contact at Five Brothers) that the property had been foreclosed upon by Home Street Bank, the mortgagee identified on the Work Order.

9.     Mr. Day was also informed that the First Street property was vacant. And, prior to entering the property, Mr. Day verified with a neighbor that no one was living at the residence.

10.   On January 30, 2023, after verifying with the neighbor that the property was vacant, Mr. Day entered the property and began the initial securing of the property pursuant to the work order.

11.   While Mr. Day was at the property, the owner of the property, Darren Rodrigues, Jr., who had in fact previously vacated the property, was alerted by a Ring doorbell camera that someone had entered the property.

12.   Mr. Rodrigues called the police and then drove to the home.

13.   Mr. Rodrigues aggressively entered the driveway at a high rate of speed.  Mr. Rodrigues came to an abrupt stop directly behind Mr. Day's vehicle which had also been parked in the driveway.  Mr. Rodrigues' vehicle blocked Mr. Day's exit and Mr. Day could not leave.

14.   Mr. Rodrigues quickly exited his vehicle and stood by the driver's side door of the vehicle yelling obscenities and "what are you doing at my house?"

15.   Mr. Rodrigues appeared to have something in his right hand and Mr. Day believed it was a weapon.  Mr. Day used lawful non-lethal force, *i.e.*, a pepper spray air gun, firing it several times in self-defense.

16.   Mr. Rodrigues threw the object that was in his right hand, which Mr. Day learned to be a Coca-Cola can shortly after it struck Mr. Day in the face.

17.   Mr. Day repeatedly instructed Mr. Rodrigues to "get back, get back" and informed Mr. Rodrigues that Mr. Day was "here with the bank."  Mr. Day also

informed Mr. Rodrigues that he "was leaving" and "back up and I'll leave."

18.     After approximately two minutes of Mr. Rodrigues screaming obscenities, Mr. Day was able to deescalate the situation.  Mr. Day informed Mr. Rodrigues that he worked for Five Brothers and asked Mr. Rodrigues if his name was "Darren."  Mr. Day again informed Mr. Rodrigues that he worked for the bank and was eventually able to place a copy of the Work Order on the hood of Mr. Rodrigues' vehicle for Mr. Rodrigues to review.

19.     Before the police even arrived, the situation had deescalated and there was no further confrontation.

20.     Shortly thereafter, the police arrived and began an investigation. Mr. Day was detained in handcuffs for approximately one hour.

21.     Mr. Day fully cooperated with the police and was calm, professional, and polite.

22.     Upon completion of the investigation, neither Mr. Day nor Mr. Rodrigues were arrested or booked.  No charges were ever brought.

23.     At no point were Mr. Day and Mr. Rodrigues involved in any domestic relationship as contemplated by HRS § 706-906, 18 U.S.C. § 921(a)(33)(A)(ii) or otherwise.  Therefore, neither 18 U.S.C. § 922(g)(9) (the "Lautenberg Amendment") nor HRS § 134-7(a) could apply to Mr. Day.

24.     Mr. Day has no criminal history other than minor traffic violations.

25.    Mr. Day is a natural citizen of the United States residing on the island of Hawaiʻi.

26.    Mr. Day has never been diagnosed with a mental disorder that would disqualify him from firearms ownership under Hawaii or federal law.

27.    Mr. Day does not take illegal drugs or abuse alcohol.

28.    Mr. Day is qualified to exercise the rights guaranteed by the Second Amendment of the United States Constitution.

29.    The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

30.    The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. 1027 (2016).

31.    Handguns are protected by the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570 (2008).

32.    And, in *New York State Rifle & Pistol Ass'n, Inc.v. Bruen,* ____U.S. , 142 S. Ct. 2111, 2135 (2022), the United States Supreme Court definitively clarified once and for all that "the Second Amendment guarantees a general right to public carry," meaning ordinary, law-abiding citizens may " 'bear' arms in public for self-

defense." *Bruen*, 142 S.Ct. at 2135. Accordingly, the "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added).

33.    *Bruen* also invalidated New York's concealed carry licensing scheme, which (as in Hawaii) was the only means for law-abiding citizens to carry a firearm for the purpose of self-defense.  The problem with the New York scheme was that it permitted a licensing official to exercise discretion in determining whether an applicant was found suitable to carry a firearm. *Id*.

34.    Prior to the Supreme Court's opinion in *Bruen*, the Ninth Circuit "along with the majority of our sister circuits, ha[d] adopted a two-step inquiry in deciding Second Amendment cases: first, the court asks whether the challenged law burdens conduct protected by the Second Amendment; and if so, the court must then apply the appropriate level of scrutiny." *See Silvester v. Harris*, 843 F.3d 816, 820-821 (9th Cir. 2016).

35.    "In the first step, we ask 'whether the challenged law burdens conduct protected by the Second Amendment,' based on a 'historical understanding of the scope of the [Second Amendment] right,' *Heller*, 554 U.S. at 625, or whether the challenged law falls within a 'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected,' " *See Jackson v. City & County*

*of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014).

36.     The first step of the analysis remains unchanged by *Bruen*, *i.e.*, courts must determine whether the Second Amendment right is burdened by the regulation or, stated otherwise, whether the conduct is protected by the plain text of the Second Amendment.  "To the extent that the first step of a court's pre-*Bruen* analysis mirrors the first step of a court's post-*Bruen* analysis, these cases remain persuasive authority." *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391, at *17 n.9 (Or. Dec. 6, 2022).

37.     Where the government action prohibits the carrying of firearms, as here, the United States Supreme Court has specifically held that the Second Amendment is burdened:

> As we explained in *Heller*, the 'textual elements' of the Second Amendment's operative clause— 'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.' 554 U.S. at 592, 128 S.Ct. 2783. *Heller* further confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.' *Id.*, at 584, 128 S.Ct. 2783 (quoting *Muscarello v. United States*, 524 U.S. 125, 143, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (Ginsburg, J., dissenting); internal quotation marks omitted).

*Bruen*, 142 S. Ct. at 2134.

38.     However, the *Bruen* majority rejected means-end scrutiny.  Instead, where a challenged government action burdens conduct protected by the Second

Amendment, including the carrying of firearms for the purpose of self-defense:

> The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'

*Bruen*, 142 S. Ct. at 2130; see *United States v. Rahimi*, 59 F.4th 163 (5th Cir. 2023) (citation omitted) (overturning conviction for violation of 18 U.S.C. § 922(g)(8) for Defendant who was involved in five shootings from December 2020 through January 2021); *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *4 (W.D. Tex. Sept. 19, 2022) ("[n]ext, the Government must justify its regulation through a historical analysis. To do so, the Government's historical inquiry must show that § 922(n) is consistent with the historical understanding of the Second Amendment."); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 4:21-CV-1245-P, 2022 WL 3656996, at *8 (N.D. Tex. Aug. 25, 2022) ("The burden therefore falls on Texas to 'affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.' "); *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457, at *3 (S.D.W. Va. Oct. 12, 2022) (if the statute burdens conduct protected by the Second Amendment, "the statute is presumptively unconstitutional unless the Government can show that 'it is consistent with the Nation's historical tradition of firearm regulation.' This analysis is constrained by the Supreme Court's definition of

'historical tradition' as the time of the founding and ratification of the Second Amendment in 1791.") (citations omitted).

39.     Hawaii state law requires that a citizen obtain a permit before carrying a firearm:

> Section 134-9 acts as a limited exception to the State of Hawaii's 'Place[s] to Keep' statutes, which generally require that gun owners keep their firearms at their 'place of business, residence, or sojourn.' H.R.S. §§ 134-23, 134-24, 134-25. The exception allows citizens to obtain a license to carry a loaded handgun in public, either concealed or openly, under certain circumstances. H.R.S. § 134-9.

*Young v. Hawaii*, 896 F.3d 1044, 1048 (9th Cir. 2018).

40.     In response to *Bruen* and to implement HRS § 134-9, Defendant Hawai'i County adopted or amended Chapter 14 of its county ordinances ("the Ordinance") to govern the carrying of firearms in the County of Hawai'i.

41.     The Ordinance retains the statewide historical tradition of delegating broad discretion to its chief(s) of police in determining an applicant's suitability for carrying a firearm.  Section 14-119.3 of the Hawai'i County Code now states "[t]he chief of police shall establish rules and regulations necessary to administer this article, pursuant to chapter 91, Hawai'i Revised Statutes."

42.     Pursuant to the Ordinance, Benjamin Moskowitz, Police Chief of the Hawai'i Police Department, and/or his designee(s) apparently established the Hawaii Police Department License to Carry (Concealed and Unconcealed) Application Processing procedure manual.  A true and correct copy of that manual is attached

hereto as **Exhibit Two** ("the Manual").

43.    The procedure for processing applications set forth in the Manual is apparently based, in large part, on the Hawaii Attorney General's Opinion 22-02 dated July 7, 2022.  **Exhibit Two**, p. 5 ¶ 6.1.  A true and correct copy of Attorney General's Opinion 22-02 dated July 7, 2022 is attached hereto as **Exhibit Three**.

44.    The Attorney General's Opinion endorses the use of discretion of the chief of police to determine which applicants are "suitable" enough to exercise their Second Amendment right to carry:

> The chiefs of police should also still require that applicants for a concealed carry license '[a]ppear to be a suitable person to be so licensed.'  *Id; see Bruen*, slip op. at 5 n.1 (discussing a 'suitable person' requirement which 'precludes permits only to those 'individuals whose conduct has shown them to be lacking the essential character o[r] temperament necessary to be entrusted with a weapon''); *id.* at 30 n.9 (recognizing that states may impose requirements 'designed to ensure only that those bearing arms in the jurisdiction are . . . 'law-abiding, responsible citizens'').

> Being 'a suitable person' means that the applicant does not exhibit specific and articulable indicia that the applicant poses a heightened risk to public safety.  The chiefs of police may consider the following factors when determining whether an applicant displays specific and articulable indicia that the applicant poses a heightened risk to public safety, such that the applicant is not 'a suitable person to be so licensed':

> 1.    Whether the applicant has been involved in recent incidents of alleged domestic violence;

> 2.    Whether the applicant has been involved in recent incidents of careless handling or storage of a firearm;

3.      Whether the applicant has been involved in recent incidents of alcohol or drug abuse;

4.      Whether the applicant has been involved in other recent violent conduct.

In sum, the only portion of Hawaii's concealed carry law – other than the citizenship requirement as applied to lawful permanent residents and U.S. nationals – that should not be enforced following *Bruen* is the requirement that an applicant '[i]n an exceptional case . . . show[] reason to fear injury to on or property' to obtain a concealed carry. HRS § 134-9(a).

**Exhibit Three**, p. 4.

45.    The Attorney General purports to rely on the language of *Bruen*.  See *Id*.

46.    Yet, the holding of *Bruen*, *i.e.*, prohibiting "may issue" permitting schemes, necessarily condemns the notion that exercise of the right to carry would depend on a government official's discretion.

47.    Notably, the Attorney General's opinion specifically purports to rely on footnote 9 of *Bruen*.  That footnote specifically states that licensing officials must apply " 'narrow, objective, and definite standards' … rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion.' " *Bruen*, 142 S. Ct. at 2138, n. 9.

48.    The Manual adopts the Attorney General Opinion nearly verbatim for both unconcealed and concealed carry permit applications, leaving the Chief with wide discretion to appraise facts, exercise judgment, and ultimately form an opinion.

49.    For applications to carry *unconcealed* firearms, the Chief is left to determine whether the applicant is of "good moral character:"

6.2.2. The applicant must be "of good moral character."

a. Being "of good moral character" means that the applicant does not exhibit specific and articulable indicia that the applicant poses a heightened risk to public safety.

**Exhibit Two**, p. 6.

50.    The Chief is impermissibly left to exercise his own discretion to determine whether the applicant is of "good moral character" by subjectively applying a non-exhaustive list of factors located at ¶ 6.4 of the Manual:

6.4. The Chief may consider the following non-exhaustive list of factors when determining whether an applicant displays specific and articulable indicia that the applicant poses a heightened risk to public safety such that the applicant is not "of good moral character":

6.4.1. Whether the applicant has been involved in recent incidents of alleged domestic violence;

6.4.2. Whether the applicant has been involved in recent incidents of careless handling or storage of a firearm;

6.4.3. Whether the applicant has been involved in recent incidents of alcohol or drug abuse;

6.4.4. Whether the applicant has been involved in other recent violent conduct; or

6.4.5. Other factors not mentioned above but reasonable and appropriate to the decision whether to grant or deny an application for an unconcealed carry license.

**Exhibit Two**, p. 7.

51.     For applications to carry *concealed* firearms, the Chief is required to

determine whether the applicant "appears to be a suitable person:"

> 7.1.2. Appear to be a suitable person to be so licensed;
>
> > a.  Being "a suitable person" means that the applicant does not
> >     exhibit specific and articulable indicia that the applicant poses
> >     a heightened risk to public safety.

**Exhibit Two**, p. 8.

52.      As with applications to carry *unconcealed* firearms, the Chief is left to

subjectively apply an almost identical non-exhaustive list of factors in determining

whether an applicant for a *concealed* carry permit is "suitable" enough:

> 7.2.  The Chief may consider the following list of factors when
>       determining whether an applicant displays specific and
>       articulable indicia that the applicant poses a heightened risk to
>       public safety such that the applicant is not "a suitable person to
>       be so licensed":
>
> > 7.2.1. Whether the applicant has been involved in recent
> > incidents of alleged domestic violence;
> >
> > 7.2.2. Whether the applicant has been involved in recent
> > incidents of careless handling or storage of a firearm;
> >
> > 7.2.3. Whether the applicant has been involved in recent
> > incidents of alcohol or drug abuse; or
> >
> > 7.2.4. Whether the applicant has been involved in other recent
> > violent conduct

**Exhibit Two**, pp. 8-9.

53.     Thus, in the County of Hawai'i, an applicant is required to convince the chief of police that the applicant is "suitable" enough to exercise his Second Amendment right.     And, rather than applying narrow, objective and definite standards, the Chief must appraise the facts, exercise his judgment, and form an opinion of whether the applicant has done so.

54.     The Chief is free to subjectively decide, *inter alia.*, what constitutes "recent", "careless handling or storage of a firearm," "alcohol or drug abuse," and "violent conduct."

55.     There is a strong tradition in American jurisprudence to condemn regulatory schemes that are dependent upon a government official's discretion.  It is well settled that "an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint." *Epona, LLC v. Cty. of Ventura*, 876 F.3d 1214, 1222 (9th Cir. 2017); See *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 772 (1988) ("[a] standardless discretion also makes it difficult to detect, and protect the public" and is thus unconstitutional.) *Kaahumanu v. Hawaii*, 682 F.3d 789, 807 (9th Cir. 2012) ("Adequate guiding standards are not provided here, given that DLNR may revoke a permit 'at anytime' 'for any reason,' and 'in the sole and absolute discretion of the Chairperson.' ").

56.     Not surprisingly, courts consistently apply this principle in the context of Second Amendment rights.  For example, the Judge Kozinski observed that "[a] right is a check on state power, a check that loses its force when it exists at the mercy of the state. Government whim is the last refuge of a precarious right." *Fisher v. Kealoha*, 855 F.3d 1067, 1072 (9th Cir. 2017) (Kozinski, J., concurring).

57.     The Southern District of New York recently found an ordinance similar to the ordinance and manual *sub judice* unconstitutional because that ordinance also permitted a licensing official to impermissibly exercise discretion in determining whether an applicant was of "good moral character."  *Srour v. New York City*, 2023 U.S. Dist. LEXIS 190340 (S.D.N.Y. Oct. 24, 2023).  The Court found New York City's licensing scheme unconstitutional because the challenged provision "allows for the denial of a firearm permit upon a City official's determination of the applicant's lack of 'good moral character' or upon the official's finding of 'other good cause'—broad and unrestrained discretionary standards which Defendants have not shown to have any historical underpinning in our country. And because that unconstitutional exercise of discretion occurs every time a licensing official applies or has applied these provisions, they each are facially unconstitutional." Id at *3. The court noted "Defendants' failure to show that such unabridged discretion has any grounding in our Nation's historical tradition of firearm regulation." *Id*. at *64.

58.     Similarly, Rhode Island's Supreme Court "will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency." *Gadomski v. Tavares*, 113 A.3d 387, 390 (R.I. 2015) (quotation omitted). The Court held that "[t]o prevent such an occurrence, we opined that 'certain procedural steps must be employed to allow a meaningful review' of licensing decisions by this Court." *Id*. at 390; see also *Mosby v. Devine*, 851 A.2d 1031, 1050 (R.I. 2004) ("One does not need to be an expert in American history to understand the fault inherent in a gun-permitting system that would allow a licensing body *carte blanche* authority to decide who is worthy of carrying a concealed weapon."); see also *People v. Zerillo*, 219 Mich. 635, 642 (1922) (striking down a Michigan statute prohibiting aliens from possessing revolvers without their Sheriff's consent).

59.     In the first week of May 2023, Mr. Day applied for a license to carry a concealed handgun by completing all of the required forms and submitting the completed forms to the HPD.

60.     On June 3, 2023, HPD denied Mr. Day's application because "the applicant has been involved in other recent violent conduct."  A true and correct copy of the letter denying Mr. Day's application is attached hereto as **Exhibit Four** ("denial letter").

61.    Worse, the denial letter states that Mr. Day cannot reapply for a concealed carry permit until May 31, 2023. **Exhibit Four**.

62.    According to the denial letter the decision to deny Mr. Day's application was based entirely on the police chief's (or his designee's) discretion, *i.e.*, the Chief found that Mr. Day's non-lethal exercise of his right to defend himself on January 30, 2023 constituted "recent violent conduct" and opined that Mr. Day was, therefore, not "suitable" enough.

63.    Notably, the letter quotes Section 6.4.4 of the manual. **Exhibit Four**. However, that section pertains to open carry permit applications. **Exhibit Two**, p. 7.  Nevertheless, the letter states that the reason for the denial was "recent violent conduct," a factor found in both Sections 6.4.4 and in Section 7.2.4 which pertains to concealed carry permit applications. **Exhibit Two**, pp. 7, 9.

64.    Defendant County of Hawaii via the chief of police executes the offending provisions of law and makes decisions as to which citizens are "disqualified" from enjoying Second Amendment rights and for what reasons. *See Young v. State of Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021) ("A facial challenge is a claim that the legislature has violated the Constitution, while an as- applied challenge is a claim directed at the execution of the law.").

65.    Defendant County of Hawaii vests the power to issue permits to carry to the police chief.  The decision to issue the permit is discretionary and that

discretion rests solely with the police chief.  HCC 14-119-3.

66.     The Chief, acting in his official capacity, is the same entity as the County of Hawaii. *See Young v. Hawaii*, 548 F. Supp. 2d 1151, 1164 (D. Haw. 2008) ("The claims asserted against Defendants Harry Kim and Lawrence K. Mahuna in their official capacities duplicate the claims asserted against the County of Hawaii.").

67.     Defendant County of Hawaii is liable as the waiver and release requirement is an independent city policy which is not required by state law. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

## COUNT I
## U.S. CONST., AMEND. II

68.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67, above, as if set forth verbatim herein.

69.     The broad discretion granted by sections 6.4 and 7.2 of the Manual to the chief of police when determining whether an applicant is of "good moral character" or "suitable" to exercise their constitutional right to carry firearms for the purpose of self-defense violates the Second Amendment and is unconstitutional on its face.

70.     Moreover, the denial of Mr. Day's application for a carry permit based on some subjective finding of "recent violent conduct" in the absence of a conviction or even a criminal charge violates Mr. Day's Second Amendment rights.

71.     Thus, the offending provision(s) of the Manual are also unconstitutional as applied to Mr. Day.

72.     There is no historical justification for depriving an otherwise law-abiding citizen from carrying a firearm based on such an exercise of discretion.  In fact, *Bruen* (and other authority) holds to the contrary.

73.     Defendant's policy of denying Plaintiff the right to carry firearms unless and until the police chief appraises facts, exercises his judgment, and/or forms an opinion that the applicant is "suitable" based on the criteria set forth in sections 6.4 and 7.2 of the Manual violates Plaintiff's Second Amendment rights.

## COUNT II
## DECLARATORY JUDGMENT

72.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 67, above, as if set forth herein.

73.     The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a).

74.     Absent a declaratory judgment, there is a substantial likelihood that Plaintiff will suffer irreparable injury in the future.

75.     There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

76.     This Court possesses an independent basis for jurisdiction over the parties.

77.     Mr. Day requests a declaratory judgment declaring that Defendant's policy which denies applicants the right to carry a firearm unless and until the police chief appraises facts, exercises his judgment, and/or forms an opinion that the applicant is of "good moral character" or "suitable" based on the criteria set forth in sections 6.4 and 7.2 of the Manual violates the Second Amendment.  The offending provisions of the Manual are unconstitutional on their face due to the broad grant of discretion to the police chief.

78.     Mr. Day requests a declaratory judgment declaring that the denial of Mr. Day's application based on the Chief's assessment that Mr. Day was not of "good moral character" and/or "suitable" due to "recent violent conduct" violates Plaintiff's Second Amendment rights.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that judgment be entered in his favor and against Defendant as follows:

1.     An order preliminarily and permanently compelling Defendant, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction to process applications for permits to carry a firearm and to determine the applicant's suitability

without allowing the police chief to appraise facts, exercise his judgment, and/or form an opinion that the applicant is of "good moral character" and/or "suitable" based on the criteria set forth in sections 6.4 and 7.2 of the Manual.   And, based on " 'narrow, objective, and definite standards' " (such as whether the applicant has ever been convicted of a violent crime, diagnosed with a disqualifying mental condition or brain defect, is the subject of temporary restraining order for domestic violence, or has been diagnosed with abusing drugs or alcohol), if the applicant is found qualified, that Defendant promptly issue the carry permit.

2.     An order preliminarily and permanently compelling Defendant, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction to process Mr. Day's application for a permit to carry a firearm and determine Mr. Day's suitability without allowing the police chief to appraise facts, exercise his judgment, and/or form an opinion that Mr. Day is of "good moral character" and/or "suitable" based on the criteria set forth in sections 6.4 and 7.2 of the Manual.   And, based on "'narrow, objective, and definite standards' " (such as whether Mr. Day has ever been convicted of a violent crime, diagnosed with a disqualifying mental condition or brain defect, is the subject of temporary restraining order for domestic violence, or has been diagnosed with abusing drugs or alcohol), if Mr. Day is found otherwise qualified, that Defendant promptly issue the carry permit.

3.     An order preliminarily and permanently prohibiting Defendant, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from denying an applicants' permit based on "violent conduct" where there is no judicial determination that the conduct actually occurred and, following such judicial determination, it is clear based on " 'narrow, objective, and definite standards' " that the conduct disqualifies the applicant from exercising their Second Amendment rights.

4.     An order preliminarily and permanently prohibiting Defendant, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from denying Mr. Day's application for a permit based on "recent violent conduct" where there is no judicial determination that any such conduct actually occurred and, following such judicial determination, it is clear based on " 'narrow, objective, and definite standards' " that the conduct disqualifies Mr. Day from exercising his Second Amendment rights.

5.     Judgment declaring that Defendant's policy which denies applicants the right to carry a firearm unless and until the police chief appraises facts, exercises his judgment, and/or forms an opinion that the applicant is of "good moral character" and/or "suitable" based on the criteria set forth in sections 6.4 and 7.2 of the Manual

violates the Second Amendment and are unconstitutional on their face;

6.      Judgment declaring that the denial of Mr. Day's application based on the

Chief's assessment that Mr. Day was not of "good moral character" and/or "suitable"

due to "recent violent conduct" violates Plaintiff's Second Amendment rights and

that sections 6.4 and/or 7.2 of the Manual are unconstitutional as applied;

7.      Nominal Damages;

8.      Costs of suit, including attorney fees and costs pursuant to 42 U.S.C.

§1988;

9.      Such other relief consistent with the injunction as appropriate; and

10.     Such other further relief as the Court deems just and appropriate.

DATED:  Honolulu, Hawaii; December 6, 2023.

Respectfully submitted,

/s/ *Richard Holcomb*
Richard L. Holcomb (9177)
Holcomb Law, LLLC
733 Bishop St, Suite 1478
Honolulu, HI 96813
(808) 545-4040
rholcomblaw@gmail.com


/s/ *Alan Beck*
Alan Alexander Beck (9145)
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
alan.alexander.beck@gmail.com

Attorneys for the Plaintiff